R. Perry WHEELER, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF the INTERIOR, BUREAU OF INDIAN AFFAIRS, et al., Defendants-Appellees.

No. 85–1375.

United States Court of Appeals,
Tenth Circuit.

Feb. 13, 1987.

D. Gregory Bledsoe, Tulsa, Okl., and L.V. Watkins, Muskogee, Okl., for plaintiffs-appellants.

F. Henry Habicht II, Asst. Atty. Gen., Layn R. Phillips, U.S. Atty., N.D. Okl., Peter Bernhardt, Asst. U.S. Atty., Robert L. Klarquist and William B. Lazarus, Attys., Dept. of Justice, Washington, D.C., and David Etheridge, Atty., U.S. Dept. of the Interior, Washington, D.C., of counsel, for defendants-appellees.

Before McKAY, SEYMOUR and TACHA, Circuit Judges.

McKAY, Circuit Judge.

The narrow issue before this court is whether the Department of Interior (Department) has authority to interfere in a tribal election dispute when the tribe provides administrative and judicial procedures for contesting its elections. After examining the briefs and the appellate record, this three-judge panel determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 10(e). The cause is therefore submitted without oral argument.

## I.

In the 1983 Cherokee tribal elections, Perry R. Wheeler was an unsuccessful candidate for Principal Chief of the Cherokee Nation. After the election, Mr. Wheeler initiated a full series of legal proceedings. First, Mr. Wheeler filed a petition with the Cherokee Tribal Election Committee alleging irregularities in the election procedures and requesting an FBI investigation, a recount, a runoff election and participation in developing procedures for the requested recount. The Committee dismissed the requests and referred Mr. Wheeler to the Cherokee Judicial Appeals Tribunal.

Mr. Wheeler then filed a petition and appeal with the Tribunal. After oral argu-

ments, the Tribunal authorized only a recount. Mr. Wheeler followed with motions asking the Tribunal to declare a runoff election, to order the Committee to comply with discovery requests and to stay any attempt to certify a winner for the office of Chief. The Tribunal heard oral arguments and, in a two-to-one decision, overruled each of Mr. Wheeler's motions. Accordingly, the Cherokee Tribal Election Board certified the incumbent Chief as the winner of the election following the recount.

Mr. Wheeler next petitioned the Superintendent of the Bureau of Indian Affairs to conduct an investigation and a hearing regarding the election procedures, to stay certification of the election results and to freeze all BIA funding to the Cherokee Nation pending the outcome of the petition. The BIA denied the requests, referring Mr. Wheeler to the Tribunal's final decision. Mr. Wheeler then appealed to the Department which affirmed the BIA's decision, finding that the legally constituted tribal government was functioning within the scope of its power and, thus, the Department was obligated to recognize the tribal court decisions rendered in this matter.

Mr. Wheeler and other plaintiffs subsequently filed a complaint in the district court seeking *de novo* review of the Department's decision. The district court agreed that the dispute was an intratribal matter and that the Department had no authority to decertify the election results under the circumstances of this case. Consequently, the court granted defendants' motion for summary judgment. Plaintiffs now appeal to this court.

## II.

Plaintiffs argue that the right of the Cherokee Nation to self-government is diminished by their failure to reorganize under the Oklahoma Indian Welfare Act, 25 U.S.C. § 503 (1982). However, the Cherokee Nation still possesses an inherent right to self-government that is recognized by legal authorities and supported by federal policy. This established right to self-

government limits the authority of the Department to resolve tribal election disputes.

The leading treatise on Indian law states: [T]he most basic principle of all Indian law, supported by a host of decisions, is that those powers which are lawfully vested in an Indian tribe are ... "inherent powers of a limited sovereignty which has never been extinguished." ... The tribes began their relationship with the federal government with the sovereign powers of independent nations. Upon coming under the authority of the United States ... certain limitations upon the external powers of tribal self-government necessarily followed. But the United States from the beginning permitted, then protected, the tribes in their continued internal government.... The established tradition of tribal independence within a tribe's territory has survived the admission of new states, citizenship of the Indians, and other changes in American life. Today that tradition of tribal sovereignty furnishes the backdrop against which all federal Indian laws are to be read.

F. Cohen, *Handbook of Federal Indian Law*, 231–32 (1982 ed.) (footnotes omitted). The Supreme Court has recognized the Cherokee Nation as a distinct organization capable of governing itself, consistent with its existence even prior to the signing of treaties with the United States. *E.g., Talton v. Mayes*, 163 U.S. 376, 379–81, 16 S.Ct. 986, 987–88, 41 L.Ed. 196 (1896); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831). Furthermore, the Supreme Court has uniformly recognized that one of the fundamental aspects of tribal existence is the right to self-government. *See, e.g., White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–45, 100 S.Ct. 2578, 2582–84, 65 L.Ed.2d 665 (1980); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172–73, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973).

The Federal Government has also adopted a policy of encouraging Indian self-government. Congress, in the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1341 (1982), elected to impose less supervision on tribal administration of civil rights disputes than it imposes on federal and state governments. The Act's legislative history indicates that this reflects a deliberate choice by Congress to limit intrusion into traditional tribal rights. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62–70, 98 S.Ct. 1670, 1679–83, 56 L.Ed.2d 106 (1978). This was reemphasized when Congress, in passing the Indian Self-Determination and Education Assistance Act, stated:

The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination....

The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of meaningful Indian self-determination policy....

25 U.S.C. § 450a (1982).

The federal courts have also encouraged self-government. Specifically, they have stated that when a dispute is an intratribal matter, the Federal Government should not interfere. *R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 983 (9th Cir.1983); *Potts v. Bruce*, 533 F.2d 527, 529–30 (10th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976); *Prairie Band of Pottawatomie Tribe of Indians v. Udall*, 355 F.2d 364, 367 (10th Cir.1966). Similarly, courts should not require the Department to act when to do so would interfere with the tribe's right to self-government. *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486, 489 (10th Cir.1983).

■ Admittedly, some special situations require Department action. If a tribe's constitution or its statutes call for the Department to take an active role in lawmaking, the Department may refuse to recognize laws that the tribal authorities have passed. *Moapa Band of Paiute Indians v. United States Dept. of Interior*, 747 F.2d 563, 564–66 (9th Cir.1984). Furthermore,

certain federal statutes require Department involvement in tribal matters. *See, e.g.,* 25 U.S.C. §§ 81, 483a & 613 (1982). Finally, since the Department is sometimes required to interact with tribal governments, it may need to determine which tribal government to recognize. Nevertheless, the Supreme Court has stated that "[a]mbiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Bracker,* 448 U.S. at 143–44, 100 S.Ct. at 2583–84. Thus, even these special situations should be resolved in favor of tribal self-determination and against Federal Government interference.

■ Consistent with these principles, the Department takes the position that, when the tribe provides a means for challenging elections, the Department has no authority to overrule the decision of the tribal government as to whether a candidate is legally elected. Plaintiffs admit that no Cherokee law or federal statute requires the Department to act in the present case. However, plaintiffs claim that since the Department can deal only with a legal tribal government, it must resolve this election dispute.

According to plaintiffs, the Federal Government has authority to interfere in tribal elections. They cite *Morris v. Watt,* 640 F.2d 404 (D.C.Cir.1981), and *Harjo v. Kleppe,* 420 F.Supp. 1110 (D.D.C.1976), aff'd sub nom. *Harjo v. Andrus,* 581 F.2d 949 (D.C. Cir.1978). However, those cases are very different from the present matter since they involved referendum elections for new tribal constitutions and were supervised by the courts rather than the Department. Moreover, the *Morris* and *Harjo* courts were responding to Department interference. For several decades, the Department had precluded the tribes from selecting their own form of government, claiming that tribal-formed governments were not valid. The courts, therefore, adopted procedures to ensure the Indians' ability to approve new tribal constitutions and to choose their own form of government.

This case presents none of the problems found in *Morris* and *Harjo.* Pursuant to their constitution, the Cherokee Nation adopted a specific form of government; and the Council of the Cherokee Nation enacted election laws. Both were subsequently approved by the Department. These election laws establish a Cherokee Tribal Election Committee primarily responsible for ensuring that elections are carried out in a manner consistent with Cherokee law, and detail specific election procedures and methods for appeal. For example, protests and requests for recount must be filed with the Committee, and any disagreements arising under the Cherokee constitution or statutes will be resolved by the Cherokee Judicial Appeals Tribunal. Cherokee Const. art. VII. Tribal elections can be, and have been, conducted under those laws.

Any election dispute can be resolved by Cherokee tribal forums, without any Department involvement. Once the Cherokee Tribal Election Board certifies an election result, the Department can carry out its statutory obligation to interact with the legal government, and does not need to reexamine the results of the tribal election. Furthermore, since the Department can only take action when it is necessary to carry out its statutory and regulatory obligations, *Goodface v. Grassrope,* 708 F.2d 335, 339 (8th Cir.1983), the scope of its authority does not extend to contesting the tribal resolution of an election.

Plaintiffs also argue that the Department has a duty to protect the Cherokee Indians' right to self-government and that to do so, it must step in under authority of its general trust responsibilities, as it did in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and *Milam v. United States Department of Interior,* 10 Indian L. Rep. (Am. Indian Law. Training Program) 3013, No. 82–3099 (D.D.C. Dec. 23, 1982). However, both *Mitchell* and *Milam* involve special situations which do not control this case.

In *Mitchell,* federal statutes and regulations created a trust and compelled Government management of certain properties owned by Indians. *See* 25 U.S.C. §§ 406–407 (1982); 25 C.F.R. §§ 163.1–.27 (1986). Under these federal laws, the Department managed the property essentially as a trustee. Indian property provided the corpus, while federal statutes and regulations provided the framework for the trust. On the other hand, our case involves no corpus, and no statute or regulation requires Department involvement in Cherokee election disputes; rather, as noted previously, federal law precludes Department action.

*Milam* is also inapposite. In *Milam,* an intratribal dispute had arisen involving the interpretation of tribal law. The tribal council had passed a resolution requesting the Chief to resign, but the Chief claimed that the meeting in which the resolution was passed had not been convened in accordance with tribal law. The Department interpreted the tribal constitution in order to determine which government it should recognize in its interactions. Significantly, this was necessary in *Milam* because no tribal forum existed to interpret tribal law. *See Goodface,* 708 F.2d at 339.

Conversely, the Cherokee Nation has a system for interpreting tribal law, and, when a tribal forum is available, courts have specifically held that the aggrieved party must seek relief in that forum. *Learned v. Cheyenne Arapaho Tribe,* 596 F.Supp. 537 (W.D.Okla.1984); *Ike v. United States Dept. of Interior,* 9 Indian L. Rep. (Am. Indian Law. Training Program) 3043, No. CV–R–81–293–ECR (D. Nev. Mar. 10, 1982). Furthermore, in *Goodface,* 708 F.2d at 335, the court, in an election dispute, ordered the Department to recognize the newly elected tribal government, but only until the tribal forum resolved the election dispute. Since a tribal forum existed, nei-

ther the district court nor the Department had power to resolve the election dispute. *Goodface,* 708 F.2d at 339. Therefore, without deciding whether the Department should become involved when a tribal forum is not available, we hold that when a tribal forum exists for resolving a tribal election dispute, the Department must respect the tribe's right to self-government and, thus, has no authority to interfere.*

### III.

Indian tribes have a right to self-government, and the Federal Government encourages tribes to exercise that right. Consequently, while the Department may be required by statute or tribal law to act in intratribal matters, it should act so as to avoid any unnecessary interference with a tribe's right to self-government. Plaintiffs have not cited, and we have not found, any federal statute or any provision of Cherokee law that requires the Department to intervene in a Cherokee election dispute. Rather, the Cherokee Nation provides a tribal forum for resolving such disputes. Consequently, the Department has no authority to take action contrary to the tribal resolution of such disputes. In the present case, the Department does not have authority to invalidate the Cherokee election, and the courts have no authority to order the Department to grant such relief. The district court correctly granted defendants' motion for summary judgment, and its decision is accordingly AFFIRMED.

---

* Courts have also encouraged self-government by requiring plaintiffs with Indian Civil Rights claims to pursue their actions in tribal courts. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *White v. Pueblo of San Juan,* 728 F.2d 1307 (10th Cir. 1984); *cf. Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980) (plaintiff permitted to pursue action in district court when no tribal forum was available). The policy we adopt here is consistent with these cases.